# Cross *v.* The State.

## *Indictment for Murder.*

1. *Homicide ; whether killing was intentional or accidental.*—Parties are presumed to intend the natural consequences of their intentional acts ; and where the evidence shows, as in this case, that the defendant shot and killed the deceased with a gun pointed at him and intentionally discharged, though he declared immediately afterwards that he did not know it was loaded, while other evidence showed that he knew in the early part of the day that it was loaded, whether the killing was intentional or accidental is a question for the jury, and the court may properly refuse to charge on the effect of the evidence.

2. *Same ; motive as proof of malice.*—Motive is one means of proving malice, but not the only means, since malice may sometimes be inferred from the absence of sufficient extenuating circumstances ; and where, as in this case, there is no controversy as to the fact of killing by shooting with a gun pointed at the deceased and intentionally discharged, though the defendant said he did not know the gun was loaded, the court may properly refuse to instruct the jury, at his request, that the failure of the prosecution to prove an adequate motive for the killing was a strong circumstance in favor of the defendant's innocence.

3. *Argument of counsel.*—An accused person has a constitutional right to be heard by himself and counsel. In addressing the jury, counsel must be allowed to select and pursue their own line of argument, and their own methods of dealing with the testimony ; and they may also state the principles of law applicable to the case, and may quote from books in elucidation of their views of the law. "Every fact the testimony tends to prove ; every inference counsel may think arises out of the testimony ; the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations, are legitimate subjects of criticism and discussion. So, also, the conduct of the accused, and his conversation (if in evidence), may be made the predicate of inferences, favorable or unfavorable ; and analogies and illustrations may be drawn, based on the testimony, on public history, or on science." These are legitimate subjects of discussion, and the presiding judge "would occupy questionable ground, if he arrested counsel in the attempt to deduce inferential facts or intents from testimony in proof."

4. *Same.*—"Counsel is within legitimate bounds, when he urges a firm and fearless administration of the criminal law, as the great conservator of human life, and of the repose of society ; and he is not within reversible grounds, when he complains generally that juries are frequently more inclined to mercy than to judgment. On the other hand, counsel may warn juries against hasty or harsh verdicts, and may invoke the humane mercies of the law, which accords to the accused the saving benefit of all reasonable doubts."

5. *Same.*—This court adopts the language of the Supreme Court of Wisconsin in *Brown v. Swineford* (44 Wisc. 282) : "It is error sufficient to reverse a judgment, for counsel, against objection, to state facts pertinent to the issue and not in evidence, or to assume, *arguendo,* such facts to be in the case when they are not ;" and adds : "If the state-

[Cross v. The State.]

ment be of facts which would not be legal evidence, if offered as such, yet, if their natural tendency is to influence the finding of the jury, the same rule would apply."

6. *Same; how revised.*—In such case, "there must be objection in the court below, the objection overruled, and exception reserved; the statement must be made of fact; the fact stated must be unsupported by any evidence, and must be pertinent to the issue, or its natural tendency must clearly be to influence the finding of the jury," else the case is not brought within the influence of the rule above stated.

FROM the Circuit Court of Madison.

Tried before the Hon. HENRY C. SPEAKE.

The indictment in this case charged that the defendant, Oliver Cross, "unlawfully and with malice aforethought killed David Fearn, by shooting him with a gun." The defendant pleaded not guilty, and issue was joined on that plea. The bill of exceptions purports to set out all the evidence adduced on the trial, but it is not necessary to state it at length. The defendant and the deceased were both freedmen. The killing occurred on the plantation of Gen. Moore in Madison county, in June, 1881, at the cabin of Robert Duke, who was introduced as a witness on the part of the State, and thus testified : "Defendant came to the house of witness, about dark, on Tuesday evening in June last, with a musket, which had a piece of rope tied to it; the rope thrown over his shoulder, and the gun hanging down. When he came up, the deceased was sitting near the ground, in the door of the cabin, which had no steps ; and the little child of witness, about two years old, was leaning on his shoulder, while witness' wife was in the house preparing supper. Defendant said to her, 'Nancy, give me something to eat.' Nancy replied, 'Who is that?' Deceased said, 'It is Oliver Cross, don't you know his voice ?' Nancy then said, 'Never mind, Oliver, I'll tell your wife, when she comes back, how you have been gallivanting about in her absence.' Defendant replied, 'She is at home now.' Nancy said, 'No, she aint.' Defendant said in reply, 'Well, that is so, she is still in Jackson county;' and then said to deceased, '*Davy, come go home with me, and stay to-night.*' Deceased said, '*I can't go, I haven't had my supper.*' Defendant said, '*Well, can't you go after supper ?*' Deceased said, '*No, after I get my supper, I want to go to see the gals,*' and laughed. Defendant said, '*Well, damn you, if you can't go, I'll shoot you*'; and stepped back, raised his gun, [and fired. Deceased fell back in the door, and Nancy exclaimed, 'Oliver, you have killed Davy.' Defendant said, '*It was an accident, I did not know the gun was loaded.*' Witness went for help. Deceased died in about three quarters of an hour. He and defendant had never had any quarrel or difficulty. Witness thought defendant was joking, un-

til the gun fired." Nancy Duke, the wife of Robert, after testifying in substance as her husband had, thus stated the conversation immediately preceding the killing : "Defendant said, '*Can't you go after you have had your supper ?*' Deceased said, '*No, I want to go to see the girls,*' and laughed, '*but I will go to-morrow night.*' Defendant said, '*It is damned impolite for you to refuse to go when I am staying by myself, and if you can't go, damn you, I will shoot you.*' Defendant said, '*No you won't, old pard, you don't do half what you say.*' Defendant said, '*Well, damn you, I will shoot you,*' and stepped back, presented the gun and fired." This witness testified, also, to the defendant's declarations, made immediately after the shooting, that it was an accident, and that he did not know the gun was loaded ; also, "that deceased and defendant seemed to be friendly, and their conversation seemed to be in good humor ; that she thought defendant was joking, until the gun fired ; that, if they had ever had any quarrel or difficulty, she had never heard of it ; and that the deceased sometimes stayed all night with the defendant." These two witnesses were the only persons present at the time of the killing.

Beverly Scott, a witness for the State, who was a cousin of the deceased, testified that, "about a month before the shooting," while he and the deceased were walking together, they met the defendant, and "he and the deceased got into a discourse ; that defendant said, during the conversation, *Davy, you got in my way once, and if you ever do it again, damn you, I will kill you in less than five years*'; that deceased laughed, and walked off; that this was all the conversation he could remember," and that neither he nor the deceased referred to it after they walked away. Another witness for the State, who worked with the defendant at the thresher on the plantation, testified that, when the defendant came to work in the morning of the day on which the killing occurred, he brought his musket with him, and placed it under the gin-house ; that the musket then had a cap on it; that at dinner-time, when one Wade picked up the gun, and pointed it about in different directions, defendant told him not to point it at any one, as it was loaded; and Wade testified that defendant said to him at the time, "Be careful how you handle that gun ; it has a load in it big enough to kill anybody." The witnesses for the defendant testified to his repeated declarations, immediately after the shooting, that it was accidental, and that he did not know the gun was loaded; also, that he helped to put the deceased in bed, and rendered other assistance, and made no effort to escape, declaring that he would give himself up.

[Cross v. The State.]

During the argument to the jury, several objections were made by the defendant to remarks of the prosecuting attorney, and exceptions reserved to the rulings of the court in allowing them. Of these, it is only necessary to notice the following : " Defendant's counsel argued, that the attentions which defendant paid to the deceased, and the sympathy shown by him for the deceased, indicated that the killing was accidental. The solicitor said, in reply, that a case once occurred in Tuscumbia, Alabama (*State v. Mitchell*), in which defendant's counsel, Gen. Walker, figured largely; and in which the defendant committed a murder with a knife, in the night-time, and, after inflicting the wound, assisted the wounded man home, and manifested great sympathy for him ; and the solicitor was proceeding to detail the facts of this case, when the defendant's counsel objected, because no such case was authoritatively reported, and because there was no evidence before the jury of the facts stated by the solicitor. The solicitor stated to the jury, that he did not state the case as evidence, but only as an illustration of human conduct ; that they might take it as hypothetical, or as an illustration from profane history, and should not believe a word of it as testimony. The court overruled the objection, and the defendant excepted. The solicitor proceeded to detail the facts connected with said murder in Tuscumbia, describing the sympathetic attention the defendant in that case paid to the deceased, and closed by stating, that, after his conviction, and before execution, he confessed his guilt. The court here said, that he did not think it right for the solicitor to state Mitchell's confession ; and the solicitor thereupon withdrew that part of his argument from the jury. The defendant excepted to the ruling of the court in allowing the solicitor to make this argument to the jury."

" The court having charged the jury as to what was murder in the first degree, murder in the second degree, and manslaughter in the second degree," the defendant asked the following charges, which were in writing : 1. " If you find that the State has failed to prove any adequate or sufficient motive for committing the crime charged, you can look at such failure as a strong circumstance tending to show the defendant's innocence." 2. " If no motive for the crime is *found* (?), this is a very strong circumstance in favor of the defendant's innocence, and tending to show his innocence." 3. " If you believe the evidence in this case, you can not find the defendant guilty of a higher offense than manslaughter in the second degree ; and you should only find him guilty of [that?] offense in the event he has been guilty of criminal carelessness or recklessness under the instructions already

given you." The court refused each of these charges as asked, and the defendant excepted to their refusal.

WALKER & SHELBY, and PAUL L. JONES, for the appellant. The following authorities clearly show that the court erred in allowing the solicitor to make the arguments to which objection and exception were taken : *McAdory v. The State*, 62 Ala. 163 ; *Tucker v. Henniker*, 41 N. H. 322 ; *Ferguson v. The State*, 49 Indiana, 33 ; *Smith v. The State*, 75 N. C. 306 ; *Brown v. Swineford*, 44 Wisc. 282 ; *Boddie v. The State*, 52 Ala. 399. The absence of all proof of motive for the commission of the offense, was a strong circumstance tending to show the defendant's innocence ; and the court should have so charged the jury, on the defendant's request. Men do not commit great offenses without motive ; and where there is evidence, as in this case there was, tending to show that the killing was accidental, the entire absence of any proof of motive is a very strong corroborative circumstance.

H. C. TOMPKINS, Attorney-General, for the State.—The argument of the solicitor did not exceed the bounds of legitimate discussion ; and while the presiding judge must necessarily exercise a discretionary power in controlling the argument of counsel, as in other matters of practice, the exercise of that discretion is not revisable. The line of argument to be pursued, the illustrations to be used, can not be prescribed by definite rules, but must be adapted to the particular circumstances of each case. That no positive proof of motive is necessary, where human life is taken with a deadly weapon, and by an intentional act, see 2 Bishop's Crim. Law, §§ 620, 657 ; *McManus v. The State*, 36 Ala. 285 ; *Hadley v. The State*, 55 Ala. 31 ; *Washington v. State*, 60 Ala. 10.

STONE, J.—Counsel has not insisted on the third charge asked by defendant and refused, and, in effect, concedes it was rightly refused by the Circuit Court. It is very clear that charge should not have been given. Parties are presumed to intend the natural consequences of their intentional acts. Two witnesses testify positively that, a short time before the shooting, the accused informed them the gun was loaded. We are not informed the gun was fired off, between that time and the homicide. The only evidence against this is, that the accused, after he had fired the fatal shot, and after he was upbraided for killing the deceased, said it was an accident, and that he did not know the gun was loaded. He repeated this assertion several times, made no attempt to escape, and remained, rendering some service

[Cross v. The State.]

in placing the wounded man on a bed.   Crime is made up of
act and intention.   The jury are the proper judges of testi-
mony, and triers of facts.   Motives and intentions are rarely
susceptible of positive proof.   It is the province of the jury
to weigh testimony, and deduce inferences from proven
facts.   Motives and intentions are inferred not alone from
the language of parties.   Actions, manner, tone of voice,
startled surprise at so fearful a catastrophe, if accidental—
all these enter into the inquiry, whether the shooting was
intentional or not.   These were questions for the jury.   The
testimony did not present a case for a charge on its effect.
1 Brick. Dig. 335, § 3, subd. 1 and 4.

Charges 1 and 2 requested were properly refused.   There
seems to have been no question raised as to the person or
instrumentality by which the homicide was perpetrated.
Neither is there question that the gun was intentionally
pointed, and the trigger pulled by the the defendant.   From
these uncontroverted facts, the law infers malice, unless ex-
culpatory circumstances spring out of the testimony which
proves the killing, or unless justification, or a reduction of
the grade of the offense, is shown by other testimony.   Mo-
tive is one, but not the only, means of proving malice.   It
may, often is, and should be inferred, from the absence of
sufficient extenuating circumstances.—*Hadley v. The State,*
55 Ala. 31. The most aggravated murders have been com-
mitted when the motive could be neither proved nor ascer-
tained.   So, even if the accused believed the gun to be un-
loaded, the death would then be traceable to a very careless,
if not wanton act, and the defendant could not be pro-
nounced innocent.—Clark's Manual, §§ 448, 449.   In any
aspect, the charges were properly refused.

The remaining questions relate to the latitude counsel
were allowed to take, in the discussion before the jury.   We
approach this subject with much misgiving, and fear we will
not be able to make ourselves understood.   Defendants have
the right to be heard by themselves and counsel.   The con-
stitution secures this much to them.   In addressing the jury,
counsel must be allowed to select and pursue their own line
of argument, their own methods of dealing with the testi-
mony.   They may state the principles of law applicable to
the case, and may argue such principles, and quote from
books in elucidation of their views of the law.   This, how-
ever, is an argument before the court, and for the court; for
the jury are not judges of the law.   It is their sworn duty
to receive and apply the law as the same is given them in
charge by the court.   The presiding judge has the same
right and power to declare—authoritatively to declare—the

(31)

law, as juries have to find the facts. Neither should or can invade the province of the other, without a breach of duty, and without detriment to the time-sanctioned theory of judicial trials. A known or intentional invasion by either, of the domain of the other, would be a gross violation of a sworn duty. Crime is made up of act or acts and intent. The law declares what particular acts, done with what particular intents, constitute the various crimes known to our criminal jurisprudence. All the graver offenses are graded both by the motive or intent which prompts them, and the magnitude of the injury done. Counsel, we have said, may state the principles of law applicable to the case on trial; for those principles furnish the rule or test, by which juries must determine whether the facts proved meet the requirements of the law. Not knowing what the law is, or what its requirements are, until instructed, the jury could not safely affirm that the prisoner they have in charge is, or is not guilty. Law furnishes the rule, and the jury determines whether the facts proved bring the case within that rule.

No human testimony is infallible. The most conscientious witnesses sometimes make mistakes. Friendship or prejudice often biases the judgments of even honest men, and witnesses often allow their predilections to shade their narratives. Here are seen and felt the beneficial effects of cross-examination. No set rules can be declared, fixing the boundaries of legitimate cross-examination. Much depends on the character of the testimony given, and the spirit of the witness exhibited in his testimony. A further preliminary remark: A large amount of the facts, which shape and mould human transactions, are not susceptible of direct proof. They are inferred from other facts known or proved. Experience and observation come to our aid, in ascertaining these inferential facts. Motives and intents are most generally arrived at, by duly considering the outward conduct of men. Testing this, by our experience and consciousness, we infer the moving motive which prompted such conduct.

We have indulged in these preliminary observations, because they bring somewhat to view the wide range advocacy should be permitted to take. Every fact the testimony tends to prove, every inference counsel may think arises out of the testimony, the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations, are legitimate subjects of criticism and discussion. So, the conduct of the accused, his conversation (if in evidence), may be made the predicate of inferences, favorable or unfavorable. Analogies and illustrations may also be drawn, based on the

[Cross v. The State.]

testimony, on public history, on science, or anything else, provided it does not invade the prohibited domain hereafter considered. The presiding judge, as a rule, will best determine when discussion is legitimate, and when it degenerates into abuse and undue license. While he should not permit wanton abuse of adversary or witness, he would occupy questionable ground, if he arrested counsel in his attempt to educe inferential facts or intents from testimony in proof. Argument is but an aid to the jury, to enable that body to arrive at correct conclusions; and it would be dangerous to accord to the presiding judge the right and power to intervene, and declare authoritatively when an inference of counsel is or is not legitimately drawn. This is for the jury to determine, if there be any testimony on which to base it. So, we hold counsel is in legitimate bounds, when he urges a firm and fearless administration of the criminal law, as the great conservator of human life, and of the repose of society; and is not within reversible grounds, when he complains generally that juries are frequently more inclined to mercy than to judgment. On the other hand, counsel may warn juries against hasty or harsh verdicts, and may invoke the humane mercies of the law, which accords to persons accused the saving benefit of all reasonable doubts. These pertain to municipal law, and to that grand public policy which is the boast and crowning honor of the common law. We ourselves have felt, and still feel, that the criminal law, notably the law of homicide, is often administered with too light a hand. This, instead of being a means of preserving human life, has a tendency directly the opposite. When juries learn that self-defense means self-defense, and not a mere vindication of insulted honor, real or supposed—means that the manslayer is so pressed and menaced, as that his life is in danger, or his person exposed to grievous bodily harm, as the law defines that phrase, before he can resort to deadly instrumentalities; then the moral and law-abiding public will cease their complaints against the law's administration. Then, and not till then, will the lawless and bloody-minded stay thier murderous hands.

In a single instance we think the presiding judge permitted counsel to transcend the legitimate boundary of discussion. In his closing argument, the prosecuting attorney was allowed to state, as *facts*, what he alleged had occurred in the perpetration of another homicide having some alleged features analogous to those developed on this trial. Now, there was not only no evidence before the jury of that other homicide, or its details, but such evidence, if offered, would have been illegal and irrelevant. This was not argument, and could

[Cross v. The·State.]

furnish no safe or permissible aid to the jury in considering, and weighing the testimony before them. The jury, in their deliberations, should consider no facts, save those given in evidence. They may and should employ their reasoning powers, aided by their experience, and by the arguments of counsel, in determining what facts the testimony establishes. This is the high purpose for which they are organized, the duty they are sworn to perform. If they allow outside influences to control them, they do as great a wrong, although, perhaps, not committing so high a crime, as if they return a verdict against their convictions of the evidence, and the law as expounded to them by the court. We adopt the language of the court in *Brown v. Swineford*, 44 Wisc 282, that " it is error sufficient to reverse a judgment, for counsel, against objection, to state facts pertinent to the issue and not in evidence, or to assume, *arguendo*, such facts to be in the case, when they are not;" and if the statement be of facts which would not be legal evidence, if offered as such, yet, if their natural tendency is to influence the finding of the jury, the same rule would apply. We sum up, lest we be misunderstood. There must be objection in the court below, the objection overruled, ·and· an exception reserved. The statement must be made *as of fact*; the fact stated must be unsupported by any evidence, must be pertinent to the issue, or its natural tendency must be to influence the finding of the jury; or the case is not brought within the influence of this rule. To come within the last clause above, namely, where the natural tendency is to influence the finding of the jury, the case must be clear and strong. We would not embarrass free discussion, or regard the many hasty or exaggerated statements counsel often make in the heat of debate, which can not, and are not expected to become, factors in the formation of the verdict. Such statements are usually valued at their true worth, and have no tendency to mislead. It is only when the statement is of a substantive, outside fact—stated as fact—and which manifestly bears on a material inquiry before the jury, that the court can interfere, and arrest discussion.—*McAdory v. The State*, 62 Ala. 154; *Tucker v. Heniker*, 41 N. H. 317; *Scripps v. Reilly*, 35 Mich. 371; *Berry v. The State*, 10 Ga. 511; *Mitchum v. The State*, 11 Ga. 615; *State v. Smith*, 75 N. C. 306.

We append to this opinion an extract from the opinion of the court by C. J. RYAN in the case of *Brown v. Swineford, supra*. It presents in strong, terse, eloquent language, the high mission of attorneyship, and the pure ethics which a profession so influential and so honored should always observe when dealing with human liberty and human rights.

VOL. LXVIII.

[Cross v. The State.]

We adopt its utterances only to the extent above expressed, and leave to the discretion of the presiding judge the suppression of all abuses, or seeming abuses, beyond what we have herein above declared presents a case for review and reversal. We need scarcely add, the rules we have declared above apply equally to prosecuting attorneys, and to counsel employed in defense.

"The profession of the law is instituted for the administration of justice. The duties of the bench and bar differ in kind, not in purpose. The duty of both alike is to establish the truth, and to apply the law to it. It is essential to the proper administration of justice, frail and uncertain at the best, that all that can be said for each party, in the determination of fact and law, should be heard. Forensic strife is but a method, and a mighty one, to ascertain the truth, and the law governing the truth. It is the duty of counsel to make the most of the case which his client is able to give him; but counsel is out of his duty and his right, and outside of the principle and object of his profession, when he travels out of his client's case, and assumes to supply its deficiencies. Therefore is it that the nice sense of the profession regards with such distrust and aversion the testimony of a lawyer in favor of his client. It is the duty and right of counsel to indulge in all fair argument in favor of the right of his client; but he is outside of his duty and his right when he appeals to prejudice irrelevant to the case. Properly, prejudice has no more sanction at the bar, than on the bench. But an advocate may make himself the *alter ego* of his client, and indulge in prejudice in his favor. He may even share his client's prejudices against his adversary, as far as they rest on the facts in his case. But he has neither duty nor right to appeal to prejudices, just or unjust, against his adversary, *dehors* the very case he has to try. The very fullest freedom of speech, within the duty of his profession, should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof. It may sometimes be a very difficult and delicate duty to confine counsel to a legitimate course of argument. But, like other difficult and delicate duties, it must be performed by those upon whom the law imposes it. It is the duty of the Circuit Courts, in jury trials, to interfere in all proper cases of their own motion. This is due to truth and justice. And if counsel persevere in arguing upon pertinent facts not before the jury, or appealing to prejudices foreign to the case in evidence, exception may be

[Billingslea v. The State.]

taken by the other side, which may be good ground for a new trial, or for a reversal in this court."

For the single error above pointed out, the judgment of the Circuit Court is reversed, and the cause remanded. Let the defendant remain in custody, until discharged by due course of law.